IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| JAMES GAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 07-5019-CV-SW-NKL-SSA |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social | ) | |
| Security Administration | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

This suit involves two applications made under the Social Security Act (the Act). The first is an application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401, et seq. The second is an application for supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. On July 28, 2006, following a hearing, an administrative law judge (ALJ) rendered a decision, finding Plaintiff was not "disabled" as defined by the Social Security Act. (Tr. 15-34.) On December 29, 2006, the Appeals Council denied Plaintiff's request for review. (Tr. 8-10.)

Pending before the Court is Plaintiff's Motion for Summary Judgment [Doc. # 7] seeking judicial review of the ALJ's decision. The complete facts and arguments are

1

presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]
Because the Court concludes that the decision of the ALJ failed to consider Gay's
impairment of carpel tunnel syndrome and failed to give proper weight to medical
evidence supporting Gay's visual impairments, this matter is REMANDED to Defendant
for further consideration.

**I.     Factual Background**

Plaintiff James Gay ("Gay") was born February 6, 1958, and was 48 at the time of
his hearing. He completed the ninth grade in school. (Tr. 103, 105.) Gay worked as a
truck driver between 1988 and 2002. (Tr. 100.) In 1984, Gay fractured his femur, pelvis,
a finger and dislocated his right shoulder in a motor vehicle accident. (Tr. 193.) Gay did
not claim disability until December 1, 2002. (Tr. 71.) During 2001, Stephen Sorokanich,
Jr., M.D., treated Gay for absolute glaucoma of the right eye; Matthew Hunter, M.D., also
treated Gay and diagnosed him with status post motor vehicle accident chronic pain,
seronegative inflammatory arthritis, chronic low back pain and carpal tunnel syndrome.
(Tr. 178, 187, 223.) Gay has no vision in his right eye and corrected vision of 20/30 in
his left eye. (Tr. 20.) Dr. Hunter prescribed him OxyContin which Gay initially refused
and then came to depend upon. (Tr. 339.) In March 2002, Gay sought treatment from
neurologist Vithal Dhaduk, M.D., who noted tenderness in the lumbar region with marked
paraspinal muscle spasms and mildly restricted lumbar spine movements. (Tr. 288.) At

---

[1]Portions of the parties' briefs are adopted without quotation designated.

that time, radiographs showed evidence of a lumbar radicular process at the L5-S1 disc due to paraspinal spasm and nervation in the distal musculature. (Tr. 285.) Dr. Dhaduk treated Gay through June 2003.

Gay returned to Dr. Hunter in April, 2003. At that point, Dr. Hunter diagnosed Gay with trochanteric bursitis and trigger fingers. (Tr. 172.) Gay also sought treatment from Phillip Boccagno, M.D., who also noted Dupuytren Contracture (tissue thickening causing fingers to curl). Gay continued to receive medication including OxyContin and Celebrex. (Tr. 208.) On May 12, 2004, Gay reported worsening arthritic pain in the hands, wrists, elbow, shoulders, knees, ankles and feet, as well as stiffness during the day. Dr. Boccagno determined that Gay was experiencing a "flare up" of his rheumatoid condition and he was disabled from any and all occupations. (Tr. 200.) On May 13, 2004, Gay reported to Eugene Grady, M.D., who diagnosed Gay with chronic widespread musculoskeletal pain. (Tr. 292.) Dr. Grady deemed Gay disabled for a twelve month period until he completed additional investigation. (Tr. 293.) On May 15, 2005, Gay returned to Dr. Boccagno complaining of worsening pain in his hands. Examination revealed synovitis of the wrists, MCPs and PIPs of both hands and a decreased ability to close his hands in a tight fist. Between the May 2004 and May 2005 treatments with Dr. Boccagno, Gay sought treatment from several physicians, motivated in part by his narcotic dependency. (Tr. 29.)

Between October 2004 and January 2005, Gay sought treatment from four different physicians. Gary Hamlin, D.O., diagnosed Gay with generalized

3

arthralgia/myalgia, blindness OD/glaucoma OD, probable OxyContin dependency, history of testosterone deficiency, restless leg syndrome, degenerative disc disease of the lumbar spine/pain in the left lower extremity, and bilateral hand dysfunction (neuropathy). (Tr. at 226.) X-rays of the same date revealed mild arthritic change involving the hip, cervical spine and mild osteoarthritis of the lumbar spine. (Tr. at 230-231.) That same month, Gay sought treatment from Dr. Kent Coltharp who diagnosed Gay with opiate dependency and fibromyalgia. (Tr. 339-340.)

In December 2004, Gay reported to Richard Kenney, D.O., a rheumatologist. Gay reported hip and thigh pain as well as intermittent headaches, pain in his feet, ankles, wrists and right shoulder. He also noted stiffness in his fingers. (Tr. 268.) Dr. Kenney's examination revealed 2+ tenderness of the right shoulder with 25% loss of motion in abduction, internal and external rotation and 15% loss of motion in forward bending at the lumbar spine. Dr. Kenney diagnosed Gay with prior history of posttraumatic osteoarthritis and possible rheumatoid arthritis, although he did not see any evidence of active rheumatoid arthritis at the time; history of chronic pain syndrome; prostatic hypertrophy and narcotic dependence. He provided him a prescription for OxyContin "because Gay could not stop the narcotic cold turkey." He was also given Naproxen, Cardura and Xanax. (Tr. 268.) On December 9, 2004, Dr. Kenney wrote a letter to Gay indicating that, other than some minimal degenerative changes in the lower back and hands, the joints looked excellent. (Tr. 266.) He also indicated that Gay did not have rheumatoid arthritis or any inflammatory joint disorder and did not require narcotic

4

medications. *Id*.

Also, in December, 2004, Gay sought treatment from Justin Stilley, O.D., for eye pain and accompanying headaches. (Tr. 273.) After Dr. Stilley's initial medical regimen did not provide relief, Dr. Stilley referred the case to Lance Brown, O.D., M.D., for his opinion. (Tr. at 273.) Dr. Brown recommended that Gay could have the right eye removed or undergo an alcohol block in order to relieve the pain. (Tr. 301.)[2] In January, 2006, Gay sought treatment from Ronald P. Swendris, M.D., who noted that Gay had significant episodes of pain largely resulting from corneal decompensation. (Tr. 305.) Dr. Swendris recommended that Gay continue with medications and consider surgery to alleviate the pain. (Tr. at 305.) Dr. Swendris noted that Gay's limitations would include: limited fine detail work because of lost depth perception; short periods of time doing paperwork and computer work with frequent breaks because of fatigue; no work with heavy machinery or moving equipment; no work off the ground and the need to wear safety glasses or goggles when injury to the remaining eye is possible. (Tr. 305-307.)

In January, 2006, Gay reported to the emergency room on three separate occasions. First, Gay reported to St. John's Regional Medical Center with chest pain and back pain. A view of the lumbar spine revealed mild degenerative changes. The emergency room diagnosed Gay with chest pain, chronic back pain and drug seeking behavior. (Tr. 321.) On January 19, Gay reported to Freeman Health System with

---

[2]The ALJ is not correct that Gay did not seek treatment for eye pain between 2002 and 2006. (Tr. 22.)

5

reports of rheumatoid arthritis and joint pain.  He was told that the emergency room could not provide OxyContin, but they would give him a short-term prescription for Darvocet.  (Tr. 337.)  Only a few days later, Gay reported to the same emergency room with problems with restless leg syndrome.  He indicated that he wanted a referral to a Methadone Clinic as well as a refill on Percocet that he just received.  (Tr. 332.)  Gay was given Neurontin and discharged.  (Tr. 332.)

Gay next sought treatment in April 2006 from Doctor's Hospital of Springfield which found that his joints were not erythermatous or enlarged and Gay was diagnosed with possible mild rheumatoid arthritis; the hospital refused to prescribe narcotics.  (Tr. 343.)  Later in April 2006, Gay was admitted to Nevada Regional Medical Center on a ninety-six hour hold for suicide ideation.  Upon admission he was diagnosed with adjustment disorder with depressed mood, r/o major depressive disorder, r/o bipolar mood disorder and assigned a GAF of 25-30.  (Tr. 357.)  Gay was discharged from the hospital on May 1, 2006.  His diagnosis upon discharge included adjustment disorder with depressive mood and r/o bipolar mood disorder.  His GAF upon discharge was estimated at 50-55.  (Tr. at 354.)

Throughout his treatment, Gay continued to pursue his disability claim.  He was initially denied in November 2004.  (Tr. 378; Tr. 51.)  Gay requested a hearing on January 14, 2005, and a hearing was held on February 13, 2006.  At that hearing Gay testified that he had problems holding onto objects, he had problems with headaches and with pain after being in a motorcycle accident in 1984.  (Tr. 390; Tr. 392; Tr. 399-

6

400.)  Gay also testified to his severe headaches, hand pain, back pain and anxiety.  (Tr. 400-406.)  The medical expert, Anne E. Winkler, M.D., testified at a supplemental hearing on May 18, 2006, that Gay suffered from impairments of blindness in right eye, fibromyalgia, and mild osteoarthritis of the left hip.  (Tr. 423.)

## II.  Discussion

The ALJ concluded that Gay suffered from severe impairments of blindness in the right eye, fibromyalgia, mild lumbar radiculopathy and mild osteoarthritis of the left hip.  (Tr. 18.)  Gay retained the residual functional capacity (RFC) to:

> stand and/or walk six hours out of an eight hour workday.  He can sit six hours out of an eight-hour workday.  He can lift and/or carry, push and/or pull, 20 pounds frequently and 25 pounds occasionally.  He may never climb ladders, ropes, or scaffolds.  He may occasionally climb stairs and ramps.  He may occasionally kneel, crouch, crawl and stoop.  He has no manipulative limitations.  He has a limited ability to work around heavy machinery or workplace hazards and may not do commercial driving.  He may not work off the ground or around unprotected heights.  He requires safety goggles at all times.  He must avoid extreme cold and wetness.  (Tr. 25-26.)[3]

Relying upon vocational expert testimony, the ALJ finally concluded that while Gay could not perform his past relevant work, he could perform work as a production assembler and small products assembler.  (Tr. 32-33.)  After consideration of the record, the ALJ determined that Gay suffered from a back impairment, which was "severe"

---

[3] The RFC closely tracks Dr. Winkler's testimony: Gay would be able to stand or walk six hours; sit six hours; lift twenty five pounds occasionally and twenty pounds frequently; push and pull; occasionally climb stairs, kneel, crouch, crawl; never climb ladders, ropes, scaffolds; frequently balance; avoid fine or detailed work because of the loss of vision in the right eye; would need to be cautious around heavy machinery and equipment; would need to avoid working off the ground, such as ladders and scaffolds; would require safety glasses; and would need to avoid the extreme cold, wetness and unprotected heights.  (Tr. 426.)

7

within the meaning of the Act. (Tr. 25.) The ALJ also determined that Gay's impairments did not constitute an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. § 404, Subpart P, Appendix 1, Regulations No. 4. *Id*. The ALJ also found that Gay was not fully credible as to his alleged level of impairment. *Id*. The ALJ concluded that Gay retained the residual functional capacity ("RFC") to perform the full range of sedentary work. (Tr. 25.)

In the Eighth Circuit, for an impairment not to be considered "severe" within the meaning of the Social Security regulations, it can have "no more than minimal effect on [a] claimant's ability to work." *Nguyen v. Chater*, 75 F.3d 429, 431 (8th Cir. 1996). A treating physician's opinion deserves controlling weight, as long as the opinion is well-supported and not inconsistent with the other substantial evidence in the record. *Singh v. Apfel*, 222 F.3d 448 (8th Cir. 2004); *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); SSR 96-2p.

### A. Gay's Carpal Tunnel Syndrome

In this case, the ALJ failed to consider the opinions of Gay's treating physicians regarding his severe impairments of carpal tunnel syndrome and the resulting limitations Gay suffers in the ability to grip and handle. Dr. Hunter diagnosed Gay with carpal tunnel syndrome. (Tr. 178.) Dr. Boccagno diagnosed Gay's Dupuytren Contracture causing his fingers to curl. After reviewing the medical record, the ALJ determined that "only one" physician had noted Gay's decreased grip and that "the hand x-rays were normal during a portion of the period at issue" and then showed only minimal

8

degenerative changes. (Tr. 29-30.) The ALJ stated that "there is no evidence of carpal tunnel syndrome or other impairment of the hands of record." *Id*. However, carpal tunnel syndrome is generally diagnosed through a physical exam and confirmed through electrodiagnostic tests, so x-rays would not support any conclusion as to carpal tunnel syndrome. *See Mulvaney v. Barnhart*, 2006 U.S. Dist. LEXIS 57114 (N.D. Ill. 2006). Gay's medical records suggest that he had trouble holding pots and dishes while cooking. (Tr. 29.) Moreover, Dr. Hunter made his diagnosis before Gay's development of narcotic dependency. Dr. Winkler's testimony, upon which the ALJ relied, stated only that Gay's hand difficulties were not due to rheumatoid arthritis or fibromyalgia; she made no determination as to carpal tunnel syndrome. *See Bentley v. Shalala*, 52 F.3d 784, 785 (8th Cir. 1995) (permitting the ALJ to resolve conflicts among treating and examining physicians). The ALJ concluded that "Gay knew that the inability to use hands would help him in receiving benefits." (Tr. 21.) Given the evidence of Gay's carpel tunnel syndrome and hand limitations, it was manifestly against the evidence to declare that "there is no evidence of carpal tunnel syndrome." The ALJ did not give proper weight to the medical evidence regarding Gay's carpel tunnel syndrome which may have also affected his ability to work.

### B. Gay's Visual Impairments

The ALJ properly considered Gay's subjective complaints of eye and joint pain. (Tr. 25.) The Commissioner may discredit subjective complaints if there are inconsistencies in the evidence on the record as a whole. *See Lowe v. Apfel*, 226 F.3d

9

969, 972 (8th Cir. 2000). *See also, generally, Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). In this case, the ALJ cited several factors supporting his decision, including that there is little objective evidence of an impairment sufficiently severe to account for Plaintiff's complaints, and that Plaintiff has made a variety of inconsistent statements regarding his allegations during periods where he sought treatment, and during this case. (Tr. 24.) However, the ALJ failed to consider the medical evidence regarding other limitations related to Gay's vision.

The medical evidence of record contains two opinions from treating physicians as to Gay's limitations as a result of his severe eye problems. First, Dr. Sorokanich completed a questionnaire as well as a Medical Source Statement in regard to Gay's limitations as a result of his right eye glaucoma. Dr. Sorokanich indicated that he treated Gay at six month intervals from January 10, 2001 through March 29, 2002. (Tr. 262; Tr. 259.) As a result of his absolute glaucoma of the right eye, Dr. Sorokanich opined that Gay would have poor depth perception because he was blind in the right eye and he should avoid heights and moving machinery. Dr. Sorokanich indicated that Gay's ability to reach, handle and see would all be affected by the limitation. (Tr. 223.) The ALJ failed to address these additional limitations. The Defendant concedes that it "would have been preferable" to address Dr. Sorokanich's opinion, but the ALJ's finding is "mostly consistent" because the RFC states that Gay should not work around moving machinery or unprotected heights. The ALJ based his assessment of Gay's abilities primarily on the report of Dr. Winkler, who did not base her RFC on Dr. Sorokanich's

10

opinion. *Id.*

Second, Dr. Sorokanich's opinion is supported by opinion evidence provided by Dr. Swendris, who provided the following limitations: limited fine detail work because of lost depth perception; short periods of time doing paperwork and computer work with frequent breaks because of fatigue; no work with heavy machinery or moving equipment; no work off the ground; and would need the ability to wear safety glasses or goggles when injury to the remaining eye is possible. (Tr. 307.) Although Dr. Swendris' opinion as to Gay's ability to sedentary work, particularly breaks due to fatigue, "surprised" Dr. Winkler, she explicitly deferred to his opinion. (Tr. 430.) ("Again, he's the ophthalmologist. I'm not.").

The ALJ did not properly consider all of the evidence when determining that Gay retained the RFC for sedentary work. (Tr. 25.) *See McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000). Because the Eighth Circuit Court of Appeals requires an ALJ to consider all evidence in the record when determining a claimant's residual functional capacity, the ALJ must consider the potential severity of Gay's carpal tunnel syndrome and additional visual limitations when determining his RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217-18 (8th Cir. 2001) (citation omitted).

### III. Conclusion

ORDERED that Gay's Motion to Reverse and Remand [Doc. # 7] is GRANTED. The decision of the ALJ is REVERSED and the case is REMANDED for further consideration consistent with this Order.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  January 3, 2008
Jefferson City, Missouri